Arthur Engel v. Commissioner. Mandel Engel v. Commissioner.
Engel v. Commissioner
Docket Nos. 27069, 27070.
United States Tax Court
1952 Tax Ct. Memo LEXIS 123; 11 T.C.M. (CCH) 807; T.C.M. (RIA) 52244; July 31, 1952
*123 Herman H. Krekstein, Esq., and Barton E. Ferst, Esq., for the petitioners. William A. Schmitt, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax and penalties against the petitioners as follows: Docket No.
Year
Deficiency
Penalty
Arthur Engel
27069
1944
$102,938.17
$51,469.09
1945
26,873.34
13,436.67
Mandel Engel
27070
1943
4,679.41
2,339.71
1944
60,239.96
30,119.98
All issues presented by the pleadings were abandoned by the petitioners at the hearing except the correctness of the respondent's determination (1) that in 1943 Mandel Engel received income from an undisclosed source which he failed to report, (2) that in their returns for 1944, Mandel and Arthur Engel failed to report their distributive shares of the income realized by a partnership consisting solely of themselves from cash payments received by it for merchandise which it sold, (3) that in his return for 1945, Arthur Engel failed to report income realized from cash payments for merchandise sold by him during the year, and (4) that Mandel Engel and Arthur *124 Engel were subject, for each of their respective taxable years in controversy, to the penalty provided in section 293 (b) of the Internal Revenue Code. Another issue, to be considered in event it is found that Mandel Engel was not subject to the penalty determined for 1943, is whether the period of limitations for assessment of tax for that year had expired prior to the respondent's determination for such year. Findings of Fact Arthur Engel's income tax return for the calendar years 1944 and 1945 were filed with the collector of internal revenue for the third district of New York. Mandel Engel's income tax returns for the calendar years 1943 and 1944 were filed with the collector of internal revenue for the first district of New York. The return of Mandel for 1943 was filed on March 15, 1944, and no consent extending the period of assessment of tax for that year has been filed. The notice of deficiency was mailed to him on February 7, 1950. Henry Engel, the father of the petitioners, has spent all of his business career in the handkerchief business. On some undisclosed date prior to 1940, he organized a firm known as the American Handkerchief Company which *125 engaged in the business of jobbing handkerchiefs. About 1940, the company went into bankruptcy. For an undisclosed period, Mandel was employed by the company as a road salesman and immediately prior to the bankruptcy his compensation was about $85 a week. When the company went into bankruptcy there was no unpaid compensation owing to him. In 1941, Mandel entered the employment of Arthur, who was conducting a handkerchief jobbing business as a sole proprietorship under the name of Century Handkerchief Company. He continued in the employment of Arthur until the end of August 1943. Mandel served as a road salesman and assisted in receiving and shipping merchandise. Arthur paid him about $100 a week for his services. The records of the collector of internal revenue for the first district of New York disclose that, beginning with 1919 and continuing through 1941, Mandel filed income tax returns for all years except 1940. In the returns for the years 1919 through 1929, and for 1933 and 1941, he reported tax liabilities, the amounts of which are not disclosed. In the returns for the years 1930 through 1932 and 1934 through 1939, he reported no tax liabilities. However, in 1943 assessment *126 of an additional tax of an undisclosed amount for 1933, and of taxes of undisclosed amounts for 1934 through 1936 was made against him. In his returns for 1942 and 1943, he reported as his only income compensation received as salesman for Century Handkerchief Company in the respective amounts of $3,191 and $2,550, against which deductions of $260 and $390, respectively, were taken as expenses incurred in earning his compensation and for which he was not reimbursed. A net income of $2,716 was reported for 1942, and $2,008 for 1943. In each of the years he was married and had one child. Mandel's account with The National City Bank of New York, for the period September 17, 1942, until it was closed on April 8, 1943, shows a balance on the former date of $500. Between September 17 and the end of 1942, 12 deposits, ranging in amounts from $50 to $400 and totaling $1,229.35, were made in the account. During the same period, 42 withdrawals, ranging in amounts from $1.15 to $169.93 and totaling $777.61, were made from the account, leaving a year-end balance of $951.74. Between January 1 and April 8, 1943, one deposit of $550, on February 27, was made in the account. During that period 24 *127 withdrawals, ranging in amounts from $2.21 to $65 and totaling $721.66, were made from the account, leaving a balance of $780.08 on April 8, 1943, which was withdrawn and the account closed on that date. Between September 17 and December 31, 1942, the lowest balance in the account was $438.23, on November 19, and the highest was $1,082.60, on December 12. Between January 1 and April 8, 1943, the lowest balance in the account was $498.87, on February 23, and the highest was $1,048.87, on February 27. Mandel's account with The Chase National Bank of New York City from April 2, 1943, the date on which the account appears to have been opened, through December 31, 1944, shows that a deposit of $600 was made on April 2, 1943. Thereafter, through August 31, 1943, ten deposits, ranging in amounts from $65.25 to $800 and totaling $2,875.50, were made in the account. During the same period 52 withdrawals, ranging in amounts from $2.02 to $500 and totaling $2,659.30, were made from the account, leaving a balance of $815.70 at the end of August. Between April 2 and August 31, 1943, the lowest balance in the account was $583.91, on June 28, and the highest was $1,433.91, on July 7. On August 30, 1943, Arthur, *128 individually and "as Trustee of David Engel and Bernard Engel, infants," and Mandel, individually and "as Trustee of Ronald Engel, an infant," entered into an agreement for conducting as a partnership, under the name of Century Handkerchief Company, the handkerchief business theretofore conducted under that name by Arthur as a sole proprietorship. While the agreement recited that Arthur's distributive share of the profits was 55 per cent, Mandel's 37 1/2 per cent, and the infants' "trusts" 2 1/2 per cent each, the petitioners concede that the "trusts" were not valid members of the partnership and that the proper distributive shares of the profits were Arthur, 60 per cent, and Mandel, 40 per cent. The partnership was to begin on September 1, 1943, and continue until August 31, 1944, and to be automatically renewed for a like period of time, unless terminated as provided in the agreement. The capital of the partnership was $30,000, of which Arthur contributed $16,000 as his share, composed of merchandise, accounts receivable and equipment totaling $12,000, and cash in the amount of $4,000. Mandel contributed his share of $14,000 in cash. The partnership, Century Handkerchief Company, *129 began business on September 1, 1943, and continued in business until July 31, 1944, on which date it was terminated by agreement between Arthur and Mandel. In the conduct of the partnership business, Arthur was in charge of the office and did the buying and selling. Mandel rendered services as a salesman. The partnership employed a woman bookkeeper who did part of the bookkeeping work and a firm of certified public accounts who did the remainder. In addition to making postings to the general ledger, taking off trial balances, examining purchase and sales invoices and checking the accuracy of their additions and postings to the books and checking schedules of accounts receivable and accounts payable, furnished by the bookkeeper, against entries in the general ledger, the firm of accountants prepared an audit statement for the use of the partners and also prepared the partnership return of income. No verification was made by the accountants of the partnership's accounts receivable and accounts payable by contacting customers and creditors. Such verification was not made because the accountants felt that Arthur's contact with the business was so close that he was sufficiently acquainted *130 with the sales and purchases that had been made as to render verification unnecessary. Between September 1, 1943 and July 31, 1944, the partnership, Century Handkerchief Company, sold merchandise to a brother of the petitioners, Isaac Engel, who conducted a business under the name of Engel's Handkerchiefs. The sales were made under varying methods of payment requested by the partnership. Some of the sales were regulary invoiced by the partnership at the selling price, recorded on its books and paid for by Isaac by check to the partnership in the amount of the invoice. In other instances, merchandise was invoiced by the partnership at less than the selling price, in which case the amount of the invoice was recorded on the partnership's books and payment was made by Isaac by check to the partnership in the amount of the invoice. The remainder of the selling price was paid in currency. In some other instances, sales were made without the issuance of invoices or the recording of the transactions on the partnership books. In these instances, payment of the selling price was made entirely in currency. Where sales were made and the invoice represented only a portion of the selling price, *131 the sale was recorded on the partnership books in the amount of the invoice. The portion of the selling price in excess of the amount of the invoice was not recorded on the partnership books. Sales for which no invoice was issued were not recorded on the books. The portion of the sales which was recorded on the partnership books was reported in the partnership return of income, but the portion not entered on the books was not reported. During the period September 1, 1943 through July 31, 1944, Century Handkerchief Company also sold merchandise to Columbia Handkerchief Company, a partnership composed of Murray Fields and Meyer Orloff. At the instance of Arthur Engel, payment of the selling price was made by Columbia by check to Century in the amount of the invoice and by currency for the portion of the selling price in excess of the invoice. The portion of the selling price which was paid in currency was not recorded on the books of Century and was not reported in its return of income. The petitioners did not include in their individual returns for 1944 their distributive shares of the income of the partnership, Century Handkerchief Company, represented by the currency payments *132 received by it for merchandise and which were not recorded on its books nor reported in its return of income. After the dissolution of the partnership, Century Handkerchief Company, on July 31, 1944, Arthur Engel continued the business as a sole proprietorship, operating under the same name as that of the partnership, and during 1945 sold merchandise to Columbia Handkerchief Company. Some of the sales were invoiced at the full amount of the selling price, were paid for by Columbia's check to Arthur and were recorded on Arthur's books and reported in his income tax return for 1945. Other sales were not invoiced and were paid for entirely in currency. In the case of other sales, the merchandise was invoiced at less than the selling price and, at the instance of Arthur, the selling price was paid by Columbia by check to Arthur in the amount of the invoice and the remainder was paid to him in currency. Sales which were paid for entirely with currency and that portion of other sales which was paid for with currency were not recorded on Arthur's books and were not reported in his income tax return. The respondent has determined that Mandel Engel's reported income for 1943 was understated *133 as a result of his failure to include income received in that year from an undisclosed source; that the reported income of the partnership, Century Handkerchief Company, for the period September 1, 1943 through July 31, 1944, and the distributive shares thereof reported by Mandel and Arthur in their 1944 income tax returns were understated by reason of their failure to report cash payments received for merchandise sold to Isaac Engel and Columbia Handkerchief Company during Century's fiscal period ended July 31, 1944; and that Arthur's reported income for 1945 was understated as a result of his failure to report cash payments received for merchandise sold during that year to Columbia Handkerchief Company; and accordingly has determined deficiencies in tax and penalties. The income tax returns filed by Mandel for 1943 and 1944 and those filed by Arthur for 1944 and 1945 were false and fraudulent and were made with intent to evade tax. Opinion The parties are in agreement that the burden of establishing fraud is upon the respondent and that the burden of showing that the deficiencies in tax are erroneous is upon the petitioners. With respect to the deficiencies in tax determined *134 against Arthur for 1944 and 1945, and against Mandel for 1944, the petitioners take the over-all position that they have discharged their burden by having submitted testimony to the effect that a full set of books was maintained by the partnership, Century Handkerchief Company, throughout its existence, and thereafter by Arthur through 1945, that the income tax returns of Arthur for 1944 and 1945 and that of Mandel for 1944 were in accord with the books and that the books and returns reflected all the net income for the periods involved, and further, that they have thereby not only shown that the deficiencies in tax are erroneous, but have overcome the evidence submitted by the respondent showing that various payments were received in currency for merchandise sold and that these payments were not recorded on the books nor reported in the returns of the petitioners. Aside from evidence submitted by the respondent as to the failure of the books maintained by the partnership and later by Arthur properly to reflect the business transacted by them, the testimony of the petitioners themselves discredits the accuracy of such books. According to the testimony of the petitioners, the partnership, *135 shortly after its formation and in order to obtain merchandise, entered into an arrangement with C. C. Egerton, who was in charge of the handkerchief division of John C. Welwood Corporation, whereby Egerton would cause Welwood to sell merchandise to the partnership, for which the partnership would pay Welwood at the latter's invoice price. Under the arrangement the partnership would pay in currency to Egerton, for his services in causing Welwood to sell merchandise to it, an amount equal to 25 per cent of the amount at which Welwood invoiced the merchandise to the partnership. The arrangement continued in effect until the dissolution of the partnership. Thereafter, until in March 1945, Arthur obtained merchandise from Welwood under the same or a like arrangement. About March 12, 1945, a new arrangement was entered into by Arthur with Egerton, whereby Egerton, in addition to causing Welwood to sell merchandise to Arthur, would cause others to sell merchandise to him, and the percentage to be paid by Arthur on the future business was fixed at 12 1/2 per cent, instead of the previous 25 per cent. As merchandise obtained under these arrangements was sold, it was invoiced at the partnership's *136 or Arthur's selling price and the transaction duly recorded on their respective books. In addition to, and over and above the selling price, currency was collected from the purchaser to provide for the 25 per cent or 12 1/2 per cent payments to Egerton. These collections in currency or "overages" were not recorded on the partnership's or Arthur's books and were not currently deposited in the bank, but were kept, in part, in a steel cabinet at the place of business, and, in part, in a safe deposit box. The only record kept by either the partnership or Arthur of the overages collected was kept by Arthur on an ordinary piece of paper which he carried in his wallet and which he destroyed in the fall of 1945 when final settlement was made with Egerton. The first, and apparently the only payment to Egerton for his services under the 25 per cent arrangement, and covering sums due by the partnership and by Arthur to that date, was made on March 12, 1945. On that date, Arthur paid Egerton $30,000 by a check which was paid two days later by the bank on which it was drawn. At Arthur's instructions, the $30,000 was entered on his books as a loan to Egerton. On the same day Arthur took from his *137 safe deposit box $14,000 in currency, which had been collected as overage, and deposited it in his bank account to cover in part the check to Egerton. The $14,000 was recorded on Arthur's books under receipts and described "Loan C. C. Egerton." (A member of the accounting firm employed by the partnership and later by Arthur, testified that when questioned about the $14,000 item, Arthur told the accounting firm that "it represented money he had loaned to Mr. Egerton and was returned by him.") Thereafter, in a final settlement made in the fall of 1945, Arthur paid Egerton $3,000 or $4,000 in currency under the 12 1/2 percent arrangement. While Arthur testified that the total overages collected from customers did not exceed the total payments made to Egerton and that the overages collected from customers and paid to Egerton were not entered on the partnership's or his books as a part of the cost of goods sold or as an expense of the business, it is obvious, from the manner in which the overages were handled, that the books wholly fail to reflect this aspect of the business of the partnership and later of Arthur. Furthermore, Arthur's action in having the $30,000 payment to Egerton entered *138 on his books as a loan to Egerton is entirely at variance with his testimony that the payment was for Egerton's services in helping the partnership and him get merchandise. In addition, his action in having the $14,000 recorded on his books in such a manner as to indicate that it had been received from Egerton in repayment of a loan, and in so advising the accounting firm to that effect, is also at variance with his testimony herein, to the effect that the amount represented currency which had been collected as overage. In the situation presented, the accounting treatment accorded the $30,000 and the $14,000, coupled with the advice given the accounting firm about the latter, indicates that the books were employed to conceal, rather than disclose, what is now claimed to be the true character of the $30,000 payment to Egerton and the actual source of the $14,000 deposit comprising part of that payment. According to the testimony of the petitioners, the partnership, Century Handkerchief Company, made some sales of merchandise to Isaac Engel, for which no invoices were issued by the partnership and which were not recorded on the books of the partnership. While such sales are claimed *139 to have been few in number and of a comparatively small total amount, the testimony is that they were paid for in currency and that the currency was put in a cabinet in the office. The Court made considerable effort at the trial to ascertain the reason why these sales and the payments therefor were handled in such manner, but no plausible explanation was advanced by the petitioners. The nearest approach to an explanation was that the partnership had a deal on with Egerton and was accumulating money to pay him. Obviously such an explanation offers no justification for selling merchandise without an invoice and for currency, which was retained in the office, and making no record on the partnership books of the transaction. From what has been said above, we think the testimony of the petitioners makes it clear that neither the books of the partnership nor those of Arthur after the dissolution of the partnership can be relied on to establish correct income. Since the petitioners ground their position on the accuracy of the books, and since their testimony, as well as the evidence submitted by the respondent, establishes that the books fail to reflect correct income, we are unable to *140 conclude that their income tax returns made in accordance with the books correctly reflected their income. The revenue agent who investigated the affairs of the petitioners and the partnership, Century Handkerchief Company, testified that during the course of his investigation he found no evidence of the overages that the petitioners testified to at the trial of these proceedings. In determining the deficiencies, the respondent has not increased the income of the partnership or of the petitioners on account of any overage, as such. So far as appears, the matter of overages was presented by the petitioners for the first time at the trial herein. Aside from the statement of Arthur that "Several accounts I sold the goods [obtained through Egerton] to agreed to pay me the overage to give to Mr. Egerton," the parties from whom the partnership and Arthur collected overages are not otherwise identified. Since it is neither shown nor claimed that Isaac Engel or Columbia Handkerchief Company purchased any of the merchandise obtained through Egerton, or that any overages were due from or were collected from Isaac Engel or from the Columbia Handkerchief Company, it would appear that no part *141 of the payments made by them, whether in currency or otherwise, constituted overages and, as such, properly comprised a portion of the $33,000 or $34,000 claimed by petitioners to have been paid to Egerton for his services in obtaining merchandise. Under the circumstances presented, we conclude that no part of the payments to Egerton are to be regarded as an offset against the amounts collected by the partnership and Arthur from Isaac and the Columbia Handkerchief Company. On brief, the petitioners intimate that in including in income the payments in currency made by Isaac Engel and Columbia Handkerchief Company, the respondent has made no allowance for the cost of the merchandise whose sale gave rise to the payments. Not only have the petitioners not offered any evidence as to additional deductions in this respect, but the revenue agent who investigated the affairs of the petitioners and the partnership testified that during his examination he exhausted all available resources in an attempt to ascertain what costs were applicable to these payments, but could find none. In this situation, and without any more information than is before us, we must conclude that the respondent has *142 allowed as a cost of goods sold the full amounts to which the partnership and Arthur were entitled for such purpose. Since the evidence shows that during the existence of the partnership Isaac Engel and Columbia Handkerchief Company made numerous payments in currency to the partnership as payments, in whole or in part, for merchandise which were neither recorded on the books nor reflected in the income tax returns of the petitioners for 1944, and that Columbia Handkerchief Company made similar payments to Arthur during 1945 which were not recorded on his books nor reported in his return for that year, and since no part of the overages paid to Egerton is to be offset against the foregoing payments, we conclude, and so hold, that the petitioners have not shown that the respondent erred in determining the deficiencies in tax against them for 1944, and against Arthur for 1945. On the record before us, we are convinced that for the purpose of evading income tax, Arthur and Mandel, as partners, caused the partnership during its existence from September 1, 1943, through July 31, 1944, to make numerous sales of merchandise where payment, in whole or in part, was received in currency, of *143 which no record was made on the partnership books and of which no portion was reported in their respective income tax return for 1944. We are also convinced that for the purpose of evading income tax, Arthur, doing business as a sole proprietor during 1945, made various sales of merchandise where payment, in whole or in part, was received in currency, of which no record was made on his books and no portion of which was reported in his income tax return for such year. Because of the foregoing, we have found as facts that Arthur's and Mandel's returns for 1944, and Arthur's for 1945, were false and fraudulent and were made with intent to evade tax. In determining the deficiency in tax and penalty against Mandel for 1943, the respondent increased the reported net income by $14,000 as undisclosed income of that year, because of Mandel's failure to disclose the source of the $14,000 contributed by him during the year to the capital of the partnership. Mandel has offered no evidence as to the item. While the respondent has not shown that during 1943 Mandel had unreported income in the amount of $14,000, he has submitted evidence which is uncontradicted and from which it properly can be *144 concluded that Mandel's income for 1943 as reported was substantially understated. From January 1 through August 31, 1943, or approximately 35 weeks, Mandel was employed by Arthur, who testified that Mandel's compensation was about $100 a week and that his (Arthur's) books would show that. (Although Mandel testified immediately following Arthur, there is nothing in his testimony at variance with Arthur's testimony respecting the compensation.) On the basis of the foregoing, Mandel's compensation during that period amounted to approximately $3,500. The only income reported by him for 1943 was his compensation from Arthur, and this was shown on his return at $2,550. Between January 1 and April 8, 1943, Mandel deposited $550 in his account with The National City Bank. Beginning with April 2, and continuing through August 31, 1943, he deposited $3,475.50 in his account with The Chase National Bank. His deposits in the two accounts from January 1 through August 31, 1943, totaled $4,025.50. That amount exceeds his reported income by $1,475.70. On April 8, 1943, Mandel closed his account with The National City Bank and withdrew his balance therein of $780.08. There is nothing to indicate *145 that that amount, or any portion of it, was deposited in his account with The Chase National Bank, which was opened six days earlier. However, if it be assumed that the full $780.08 was deposited in the account with The Chase National Bank and that amount be subtracted from the total of $4,025.50, there would remain deposits amounting to $3,245.42. The latter amount is $695.42, or more than 27 per cent, greater than Mandel's reported income. Since Mandel appears to have drawn freely on the accounts at will and for such amounts as desired, and opened one account and closed the other when it suited him, we conclude that the funds in the accounts were his own, to do with as he pleased. Furthermore, since what would appear to be the minimum net deposits, $3,245.42, falls within the limit of what Arthur's testimony indicates was Mandel's compensation, we conclude that deposits at least to the amount of the $3,245.42 constituted income to Mandel and that his reported income was understated accordingly. No reason appearing for reaching any other conclusion, we conclude that the understatement in income was for the purpose of evading tax and have found as a fact that Mandel's 1943 income tax *146 return was false and fraudulent and was made with intent to evade tax. Having reached the foregoing conclusion, it becomes unnecessary to consider the issue of whether the period of limitations for assessment of the tax for 1943 against Mandel had expired prior to the respondent's determination for that year. Since Mandel had the burden of showing that the deficiency in tax determined against him for 1943 is erroneous, and since he has submitted no evidence directed to that end, the respondent's determination of the deficiency is sustained. Decisions will be entered under Rule 50.